Next, we have case number 24-12954, Paris Anderson v. Antonio Clemente Rodriguez. Next, we have case number 24-12954, Paris Anderson v. Antonio Clemente Rodriguez. Good morning, your honors, and may it please the court. Assistant County Attorney Zach Vosler. I represent Miami-Dade County, and for the purposes of this argument, I will be arguing on behalf of both appellants, the county and Anthony Rodriguez. This court has long declined to entertain excessive force claims that are based on the use of de minimis force by law enforcement, even if the force was unnecessary. And it continually reaffirms that the de minimis force exception is separate from Graham v. Conner. Here, we argue that the district court misapplied the legal standard when it held that because the Graham factors weighed in the plaintiff's favor, the force that the officer used could not have been de minimis. I'll just say, I don't get that as a legal issue because if the Supreme Court has said in Graham that something is excessive and violates the Constitution, where do we get off saying that it doesn't? I don't understand how we could do that. This court has continually reaffirmed since Nolan when it went back to the claims from Post and cases that Post dated Graham because Graham includes that language about the not every push or shove. I agree, but I guess I think your argument is that you can have something that violates Graham, but it's nonetheless doesn't violate the Constitution because it's de minimis. The way I see our cases is if it's de minimis, it doesn't violate Graham. Do we have a difference of opinion on that? I think that's where the best example of the interplay between the two is in Vineyard versus Wilson because in that case, there were four instances of force. In all of those instances, the Graham factors weighed in the plaintiff's favor because it was not a severe crime. She did not pose a threat to that officer, and she was not resisting. But the first use of force pre-handcuffing when he jerked her out of her chair without giving her an opportunity to stand up, this court said that that was a de minimis use of force. And the fourth use of force where they arrived at the jail and the officer dragged the plaintiff out of the car by either her shirt, her arm, or her hair when she was handcuffed, that was also a de minimis use of force even though the Graham factors weighed in her favor. It was only the third use of force when he got out of the car and pepper sprayed the plaintiff in the face while she was handcuffed in the back seat. That force was excessive. The court even recognized that there was a strong argument that the second use of force where the officer grabbed the plaintiff by the arm and bruised her arm and her breast may also have been a de minimis use of force. But in that entire circumstance, and from the beginning of the officer's interaction to the plaintiff to the end, she was not suspected of a serious crime. It was disorderly conduct and obstruction. She did not pose a threat to the officer because after the first use of force, she was handcuffed, and she did not resist him. The worst that she did was she was, according to the case, she was insulting him and kind of goading him. Right, but we said in Vineyard, we said that Graham – well, this is a quote from another of our cases. Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight, right? But like isn't our de minimis rule just about that, what is reasonably proportionate to the need for the force? I guess I don't see anywhere in Vineyard, and maybe I'm wrong. I don't see anywhere in Vineyard where we said this violates Graham, but we've created an exception to Graham for some level of force. I think the best explanation of it being an exception comes from Nolan, which was, again, when they went back to Post and they looked at Post and Gold and Jones, all of which involved some minimal amount of force without applying the factors from Graham. But they think that they're – and I guess it's based on the – that observation in Graham about the not every push or shove violates the constitution even if it may seem unnecessary. And I guess that's my point is it seems like you're defending a proposition that's very difficult to defend and I don't know whether you need to. Graham incorporates the idea that if you're arresting someone and you use whatever force is necessary to arrest them, then that's not excessive, right? That's incorporated in Graham, right? Correct. In other words, the de minimis rule – or however you want to call it. You call it an exception, but the rule, the principle is essentially a shorthand, which is for some uses of force, it's so minor that we don't have to go through and encant all of these elements. They just are by necessity not excessive. Is that what you're arguing to us or what you're arguing to us, what Judge Brasher asked at the beginning, that something can be excessive under Graham and yet we would find it not to be excessive under this exception? No, Judge. I'm arguing what your first proposition, which is that some forces are so minimal that Graham does not apply. And I would like to – If that's what you're arguing, then let's talk about that. So the way I understand our de minimis exception in Graham and the way it works together is that if you've got a reason to arrest someone, you can use the force that's sort of necessary to arrest that person. And we've said like that's de minimis. So just think of all sorts of examples, right? Taking someone handcuffed behind their back, pushing them against a wall, searching them roughly, things like that, right? How is slapping someone across the face that kind of thing? So let me just give you – let's say you're going to arrest someone and they're standing there. You've got an arrest warrant and you say you're under arrest. Can you just slap them across the face? Under that hypothetical, I would say likely that – I think it would still be a de minimis use of force. So the answer is yes. You think that as part of any arrest, you can get – you get one free face slap. The police get one free face slap? If it's phrased that way, then no. Okay. I would like to – That's the way I think you're arguing it. But under the circumstances, there are certain amounts of force that are minimal. And here we have, as you saw – Aren't those – I mean I guess my point – aren't those the forces that would be sort of reasonably necessary to effectuate an arrest? That only what's used in handcuffing is necessary to effect an arrest? Is that what you're asking?  No. So, I mean, reasonably necessary. You could push someone up against a wall. You could pull their arms around their back. You can search them. People don't like to be searched. Sometimes that's really rough. You can maybe hold them down if you need to. There are all sorts of things that we've said. Like this part of arresting someone, like we're not going to go through the gram factors. Once we decide that the police can arrest you, we're not going to go like they scraped your knee or they pulled your back or they, like, held you tightly when they were pulling you out of the car. Like we're not going to assess those things. And those things seem very different than just walking up to someone and slapping them across the face.  I mean, obviously in this case it was not – the officer did not just walk up to the plaintiff and slap him in the face. You saw – we put the image in our reply brief that the plaintiff got so close to the officer that witnesses believed that they touched. But I'd like to – I think what best answers that question is one of the cases that we cited in the 20HA letter, the AG versus Britt, where Judge Schelecki were on the panel, where two school resource officers were responding to what they believed was a fight involving a 14-year-old. And one officer choked the plaintiff for a couple of seconds while the plaintiff was not obviously resisting. The court found that that use of force was de minimis. And the second officer picked the plaintiff up at the waist, carried him a few steps, threw him to the ground, hitting his head against a brick wall, and dragged him across the floor. That was also a de minimis use of force. Let me ask you, is there – you're relying on case law a lot. Is there evidence that suggests that what was done here was done as part of the arrest? In other words, it wasn't just a free slap because I felt like slapping somebody before I put handcuffs on them, but that slapping them was part of the arrest in the same way that putting someone's arm behind their back and pushing them up against the wall or pushing them on the floor and putting your knee on their back would be. Is there any indication in the record that this was part of that? Right. I would have to double-check. But Lee, there's testimony by the officer that he used that slap as a distractionary blow to kind of catch Ms. Anderson off guard so that he could immediately take her down in handcuffs. Is there any dispute in the record that that was in fact what it was used for? Not that I know of. Well, she testifies that she didn't touch him, and the video doesn't obviously contradict that. So don't we have to take her version of the facts?  He's yelling in his face is what she's doing. Correct, and I never argued that – and we made sure to make that clear in the brief that we never argued below that Ms. Anderson did touch Officer Rodriguez. What we argued was that she got so close to him that witnesses believed that they touched, that here we have an officer who is being approached by a subject, that she is this close to his face, whether she touched him or not, that she was being disorderly, she was not obeying his commands to get her back so they could leave because she had been – American Airlines had refused to honor her ticket, and they needed to undergo their duty to escort her out of the terminal because she was not allowed to be on the secure side of the airport. Actually, what he said was that she headbutted him, and the video refutes that. He did say that she headbutted him. You didn't even argue that, that she headbutted him. We did not argue in the summary judgment motion that she headbutted him. We only argued that a reasonable officer in the circumstances, that if a subject who had acted in the way that Ms. Anderson acted, approached them and got that close, that he was allowed to use some level of force to affect her arrest. And just to be clear, this wasn't a little, like, snap, come back to your senses. He rears back, slaps her across the face, and her head swings back. Isn't that what the video shows? It does. But – So why don't – let's just skip the de minimis thing and just argue, like, is this excessive? And is this – we're here on qualified immunity, so, I mean, the point is – well, I know you want to represent the county too, but the point for the qualified immunity question is does he get qualified immunity? Does he get qualified immunity? Let's just assume I think it's not de minimis. That doesn't mean you lose, right? No, because then we would have to show that it was – the plaintiff would have to show it was clearly established. And as we argued in the brief, or at least the briefing, it kind of centers on that second method of proving clearly established law because they don't rely on a case law with indistinguishable facts. And they're not arguing that this is just so beyond that this is an obvious clarity case, that the plaintiff and the district court are both relying on that general principle, barring gratuitous and excessive force, when a suspect is under control, not resisting, and obeying commands. We think the video shows that at the time that – at least when the slap was used, Ms. Anderson was not under control. She was resisting, and she was not obeying his commands. We laid out in the brief that the video shows that he ordered her five or six times to go and get her bag. She refused to go and at one point then said that she should go and punch the American Airlines employee in the face to give them a reason to lock her up. But we believe that the principle was too broadly stated to control the inquiry and that the officer would be entitled to qualified immunity. Thank you. Andrew Greenlee Good morning, Your Honors. My name is Andrew Greenlee. I'm here on behalf of Ms. Paris Anderson. I'd like to start by addressing the de minimis inquiry where my friend spent most of his time. I think that I agree basically with the formulation of Judge Brasher that where there is – there is going to be some force inherent when you effectuate an arrest. And I think that the kind of through line in the cases is where the force that's used is gratuitous. And by gratuitous, I mean outside of what's necessary to effectuate an arrest. Then that can be excessive. I don't believe that the Graham factors are somehow inappropriate to consider. I think that that's what Graham is all about is whether it's de minimis or whether it's excessive. And the whole point of Graham is to kind of lay out the parameters of how you think about whether or not the force was justified. Was there evidence – we'll start with this question. Was there evidence in the record presented by the officer of the county that the slap was part of and seen by the officer as necessary to effectuate the arrest here? The – I think there is – I mentioned that it was a distractionary blow. I don't think we need – And that was part of the training in this sort of situation and how to handle that, right? I didn't see anything about his training in terms of the distractionary blow. Again, I mean I think it's – So my next question is was that controverted in any way such that there was an issue of disputed fact as to whether this was done for that purpose? Yes, we think that it was beyond the scope of what was necessary to effectuate the arrest. I know that. Was he fired for violating policy when he effectuated this arrest? I believe he was. So that might be evidence that he wasn't following policy when he effectuated the arrest. But in terms of his – what the purpose was, was there anything in the contrary evidence for what the purpose was? By purpose – In other words, there's a difference between I just want to go up to someone and slap them and I later arrest them. That's not for the purpose of arrest. That's for my own terrible purpose for wanting to hurt somebody. Then there's the I slap someone and immediately put them on the floor and arrest them as part of one act in the same way that taking someone's arm and putting them up here or shoving them against the wall or shoving them on the floor and putting a knee on top of them such that they break their tooth and have lacerations on their face. Those are all done for purposes of effectuating an arrest. Was there anything contrary that the slap was done for that sort of purpose? Not that it wasn't excessive. I think the video itself is the evidence that we would rely on, that it was not necessary to effectuate the arrest. I mean he could have gone about it the normal way. Necessary, that the purpose of doing it was. I mean there's lots of things that we probably have said are de minimis that maybe were more than we needed at that moment. I think you would admit that if you look at the cases. I would admit that, and I do take your point, and maybe I was being imprecise with the language that I was using. What I guess I meant was that it was gratuitous in the fact that if you watch the video, he, you know, to call it a distractionary blow is really a euphemism because what it was is he went back and, but for the fact that this was an open hand and it was a slap, I don't think we'd even, we wouldn't even be here. If it was a closed fist, clearly that would have been excessive. And the effect of the blow, if you look at her head, the way it swiveled back, it was as if it were a, it was as if it were a punch. I think that my friend in his briefing, or actually in his supplemental authority letter, he cites to a case Shepard that's quite helpful to us, and I commend him for bringing that case up because the analysis is exactly the analysis that the district court engaged in here. The conclusion was the same as the district court. They went through the gram factors, and it's a 2025 case, so to the extent that the gram factors are somehow impermissible in evaluating whether a use of force is excessive or de minimis, I think his own supplemental authority refutes that notion. And in the Shepard case, they talked about how it's not so much how you characterize the force, whether it's a slap or whether it's somebody kneeing somebody and, you know, pushing them onto the ground to where they were asphyxiated for several minutes or something like that. It's the quantum of force and the effect of the force, and on the other side, the proportionality and whether it's justified under the circumstances. And that's kind of what gram is getting at, right? So if somebody is coming and it's a murder case, you know, and somebody, I think the other supplemental authority, the guy was known, he was, you know, a white supremacist, was known to carry a submachine gun, I think a little bit more leeway will be given to the cops when they effectuate an arrest in that circumstance because the person is quite dangerous. And so we will, you know, we'll give them a little bit of grace in that scenario. In this scenario, she's behind the TSA line, so we know that she's not armed. She can't be armed because she's in that protected area. There are cops all around. She's, you know, she's not resisting arrest. I think the court, the district court's analysis is quite well-reasoned, quite thorough. The district court judge clearly was attentive to watching the videos and concluded as a juror could that the force was far beyond what was necessary. Let's talk about the qualified immunity question. So it seems to me that you're relying on the broad principle. And the broad principle, as I understand it, is gratuitous and excessive force cannot be used where someone is subdued, not resisting, and complying with instructions. I'm not quoting, but that's a paraphrase. That's correct, Your Honor, yes. In looking at the video pre-arrest, is she complying with orders, subdued, and not resisting instructions that are given to her? Does the record, what in the record shows at the summary judgment stage that that is? That's what the district court found, first of all. And I know that this is de novo. You don't have to defer it to the district court. Well, we're looking at the video. So a number of times, and let me be clear. I'll speak for myself. What happened here should not be condoned in any way whatsoever. The behavior here was just not correct. But what was going on was someone who was acting up with a private individual such that police had to be called, that when they were called, at least the first officer who interacts is actually fairly calm in trying to explain things. Your client's not. And she's instructed to do something by that officer. She doesn't do it. She's instructed by other officers to do something. She doesn't do it. And then when she threatens violence against a private individual, and then she approaches to the point of, I agree, there's no head-butting and there's no touching. But as close as you can get to someone without touching them and yelling in their face and cursing at them, is that compliant? Is that non-resisting? Is that following orders and instructions? I would say that Ms. Anderson wasn't a paragon of etiquette and professionalism in that particular moment. And her interaction was— And neither was the officer that she was dealing with. Right. So, look, you can be, in the case of say, you can be a nuisance, you can be mouthy without being a threat to the officer. And I think that while she did, and by the way, I agree with you, I commend Officer Alvarez in his comportment. And the way he tried to de-escalate, that's how it should be done. By contrast, Rodriguez, he was rage-baiting her. Go, go, go, punch him, punch him, punch him. On the video, he actually walks toward her, right? He does. The way I see the video and the way I think a reasonable juror could see the video is she takes some steps in his direction. He actually is the one that comes close to her face, and she's not the one who comes close to his face. That's exactly right, Your Honor. Both of them were almost disregarding the fact that he was a law enforcement officer. He was acting as if he were on the street as a civilian. She was acting as if she was on the street, and she walked up to him. And, yes, he walked up closer to her, and they were face-to-face. It was a tense moment. Was she a threat to him? That's a jury question. That's not the – the threat isn't the test under the general principle you're relying on. You've used that term, threat, a couple times now, but that's not the test. The test is, is this someone subdued, compliant, and not resisting? And I guess if her failure, I think, six or seven times to comply with orders and yelling and giving profanity, threatening violence to a private individual, and at least approaching the officer in an upset manner, I think is a fair way to characterize the video. Does that meet the test, whether it's Patel or Ingram or one of the applications of Patel? I do think she does meet the test. I think that as the district court found, she wasn't disobeying their commands. She asked clarifying questions. She said, you know, go get your bags, but where are we going? She's, like, genuinely confused. How can she get home to Chicago if she doesn't have her bags, and where are we going? I mean, it's a legitimate question. She, you know, it doesn't appear that she was altogether very sophisticated. It seemed like she needed or she believed that she needed the paper ticket in order to get a refund, and so she was reluctant to leave without getting this paper ticket, which to her, I guess, was worth several hundred dollars or however much she paid for the ticket back to Chicago. She was clearly emotional. She had experienced a death in the family. That's evident. She told that to Mr. Alvarez. She was just trying to get home to Chicago, and she didn't understand how leaving the terminal was going to get her closer to Chicago. And so the questions that she asked, to the extent that she didn't obey commands, first of all, they also weren't really commands, so to speak. It wasn't as if the officer said, get out of your car right now. He said, go get your bags, you know, and she said, well, why do I need my bags? Wasn't it get your bags, and it was said six separate times? They said it on a—I haven't counted, Your Honor. They did on several occasions. Am I close? I think you're close. They said, get your bags, yeah, and I'm not running from the facts here. The video shows what it shows. And my client is, you know, she could have behaved more— Can I ask you about a separate part of this? We didn't talk about this with your opposing counsel, but I want to talk about it with you because I actually think there's a better case for you. I don't know if it's a winning case, but a better case for the second part of this, and that is after she is handcuffed, there is an additional amount of force that is used. There is a hair pulling that's done on the walk from the restricted area to the outside area. Yes. Is there anything that could be fairly interpreted based on the video as resisting before the hair pull? Before the hair pull? You're talking about after she's arrested. So she's in the handcuffs. She's in the handcuffs, yeah. So the two officers are walking. One is leaving to go get the bag. The other, I think it's Officer Rodriguez, is walking, and he pulls her hair. Right. Before the hair pull.  Is there anything in there that could be interpreted as resisting or noncompliance? Not that I saw in the video. She slowed down slightly, I think, at one point and correctly advised them, hey, that's not my luggage. You have the wrong bag. You have the wrong bag. I've watched this many, many times, as we all have. Is there her jerking? And when that's going on, as she realizes that the bag is not hers, and she's yelling to go get the right bag, is there a jerking of her elbows? So the way it looks to me is the officer who's escorting her, who has her in hands, sort of has her, like, by here and walking her. And is there any indication in the video that she, like, pulls that shoulder back or shrugs that shoulder or moves that shoulder? Yes, like that. There is a gesture. Could that be interpreted as fairly or reasonably as resisting the, sort of, the hand that the officer has on her as he's escorting her? By resisting, like, resisting arrest, would she be subject to prosecution or anything? I don't think so. No, I don't mean by prosecution. But I do mean in the Patel sense of when someone is handcuffed, the general principle that you're relying on is where someone is compliant, non-resisting, and— I don't— Sorry. Pardon me. Oh, I apologize. Go ahead. I don't think that rises to the level of resisting such that it would take it outside of Patel and the other cases that talk about the gratuitous use of force against somebody who's not resisting and is otherwise compliant. I do agree with you that the use of hair, the grabbing her by her hair, was startling, disturbing. And I think it was quite clearly excessive. She was in handcuffs. She was compliant. She was walking. I mean, and that's what the district court found, and we defend that decision, that she was just walking. And to the extent that she kind of went, like, you know, and shrugged a little bit, I think she was kind of turning around to kind of look at the luggage and draw their attention to the luggage and really impress upon them that that was not her luggage. She wouldn't be able to go anywhere because she didn't have her identification in her phone. So I think it was a shrug that was born out of vexation that she had also just been slapped across the face in quite a violent manner. On the slap, so the most concerning thing about me about the video from the perspective of what your client did is that she did raise this idea of going and hitting the gate agent herself. You know, so they're talking. You're right, the one officer is kind of, like, trying to calm her down, and then she's like, look, I'm just going to go punch the gate agent, and then you guys can arrest me. Had she started to do that, wouldn't it have been justified for an officer to, I mean, I think tackle or slap her or something to stop her from doing that? Two points on that, and I see my time has expired. May I? Yeah, please, yeah. Two points. Number one, Officer Rodriguez clearly wasn't concerned about that because he actually instructed her to go punch her. Yeah, I know. I guess my point is, had he been, I mean, that was stupid police work, right? Yeah. But, like, had he been like, you should do it, and she's like, you know what, I will, and she started walking that direction. Different case. You could totally do something. Totally different case. What was your second point? That was my second point, actually, that it would be a different case, and I take your point that once violence is introduced, the situation becomes more volatile, and a greater quantum of force is appropriate under those circumstances. Thank you, officers. Just a few things, Your Honor. First, I'd like to direct your attention to its docket entry number 76-8, which is the declaration of one of the members of the departmental disposition panel that reviewed the allegations that Officer Rodriguez had used excessive force, and it found that the allegation that he used excessive force when he slapped her was not sustained, and the allegation that he used excessive force when he grabbed her hair, he was exonerated. So Judge Brasher, you had mentioned, was the officer fired. He was, but he was not fired over the force. He was fired over his decision to escalate the situation by encouraging Ms. Anderson to punch the American Airlines employee. I want to talk about the post-handcuffing force because we did not, in my initial argument, we did not talk about the hair grabbing. And I think we still go back to that the grabbing Ms. Anderson's hair for 10 or 12 seconds was still a de minimis use of force. The problem is I think you're on weaker ground, speaking only for myself. You're on weaker ground in that we've seemed to distinguish this excessive force principle, I'm going to call it the principle, from pre- and post-handcuffed. It seems that at the handcuffing point is the point at which we say this really doesn't, whatever we said before on this other stuff doesn't apply. Sanders sets that out I think as best as we've articulated, but there's other cases too that have distinguished it. And I know you're, I understand with Vineyard, I know you point to Vineyard. And it may be that that's the case. But Sanders actually dealt with the distinguishing between those two and when they come in and when they don't come in. And I just don't think you can just rely and say, well, the hair pulling is kind of de minimis when she's handcuffed at that point. I think there needs to be something, speaking for myself, there needs to be something more. And so what is that more that would, for why you should get qualified immunity and or win on the constitutional issue? Well, I want to go back to POST, which also has post-handcuffing use of force. And in that the plaintiff was being arrested for a code violation and there was some force that was used in handcuffing him and then they were walking outside and the plaintiff was continuing to speak. And the officer said to him- Just assume for the moment I'm not convinced by that. Okay. Tell me why you should still win despite the fact I'm not convinced by what you've just said. Okay. I think that there, I mean, our argument is just that there is some level of force, even post-handcuffing, that we have POST, we have Alston, we have Vineyard, that- So you can't answer my question. Is that what you're saying? Well, I mean, I think your argument is that if you have the right to escort her out of the airport, they can use some force to escort her out of the airport, right? In the same way we've said you can, if you have the right to arrest her, you can use some force to arrest her. But it's different from Saunders in that in Saunders, the plaintiff was lying on the pavement. He was subdued. He was under control. He was handcuffed with his hands behind his back and he was laying on the pavement. Here, the walk from where she was handcuffed- This is what I want to get to. Tell me what about that walk justified the use of something. So she was- What you mentioned about the movement of her arm is enough that he was trying to get her to continue to walk. She was slowing down. The district court did agree after reading the video that Ms. Anderson did slow down as they were walking. It was a long walk. It took about 10 minutes for them to get from the gate to outside the terminal. And the video does show her moving her arm in some way, but she's not- Whether it's a shrug, whether it's a jerk, I don't want to characterize it too specifically. But there is some movement in that she's turning her head. She's yelling at Officer Alvarez about the luggage. And so Officer Rodriguez grabs her by the hair to pull her forward. Now, it's different than- I know we're calling it hair-pulling and hair-grabbing. I mean he's grabbing her by the hair to direct her head forward and telling her to walk so that they continue to walk out of the terminal. Can I get you to address one more issue? I see you're over time. But if we were to say that the officer had qualified immunity for some or all of this, how would that affect the claim against the county? So in my hypothetical, we don't say that it's not excessive force. We just say not clearly established law. Would the claim against the county continue or would that be barred by some theory? No, the claim against the county would continue. If the court finds that the force was not excessive because it was reasonable, then the claims against the officer- And the county both go away. But if the court holds that the force was unreasonable under the circumstances but Officer Rodriguez is entitled to qualified immunity because it's not clearly established, the battery claim against the county would survive. Okay. Thank you. Thank you.